Gerald B. LEFCOURT, suing on behalf of himself and all others similarly situated, Plaintiff,

v.

The LEGAL AID SOCIETY, Edward O. Carr, Jr., Anthony F. Marra, Milton Adler, Edward Everett Watts, Jr., and Robert P. Patterson, Jr., Defendants.

No. 68 Civ. 2768.

United States District Court, S. D. New York.

May 11, 1970.

**1106**

Lubell & Lubell, New York City, David G. Lubell and Stephen L. Fine, New York City, of counsel, for plaintiff.

William L. Lynch, New York City, Henry P. Wasserstein, New York City, of counsel, for defendants.

LASKER, District Judge.

This action, brought by an attorney who claims wrongful discharge by his employer, illustrates the agonizing difficulties faced by those responsible for defending accused persons in the appallingly overcrowded metropolitan courts of the country.

Gerald Lefcourt graduated from law school in 1967. While at law school his strong interest in defending indigent persons accused of crime was evidenced in a number of ways. He assisted in the formation at his law school of a chapter of the Law Students Civil Rights Research Council, an organization devoted to the recruiting of law students to aid lawyers engaged in civil liberties and poverty litigation, and during his last year at law school he served as a volunteer legal assistant for The Legal Aid Society.

At the end of January 1968, Lefcourt was employed as a full-time staff attorney by The Legal Aid Society ("the Society"). He served with the Society until June 10, 1968, when he was discharged. Lefcourt contends that he was discharged "solely because of his exercise of his First Amendment rights in being openly critical of the Society and for organizing the Association of Legal Aid Attorneys of the City of New York,[1]

---

1. On its face the claim that Lefcourt's discharge was caused in part by his participation in the organization of the Association

of Legal Aid Attorneys of the City of New York appears to be within the jurisdiction of the State or National La-

and "that his discharge by the Society was wrongful and unlawful and that the things plaintiff said about the Society were true."[2]

Claiming that The Legal Aid Society is an instrumentality of the state in its relationship with its legal staff and that its acts with respect to the staff constitute state action, Lefcourt argues that the court has jurisdiction of the action under 28 U.S.C. §§ 1331(a), 1343(3) and (4), as well as 42 U.S.C. § 1983. He contends that his discharge was violative of his constitutional rights of free speech as guaranteed by the First and Fourteenth Amendments, and that jurisdiction is predicated either upon the federal question statute, 28 U.S.C. § 1331(a), or on the basis of unconstitutional state action under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983. It appears that the federal question presented under § 1331(a) is the same as plaintiff claims under 42 U.S.C. § 1983, which provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The defendants' position is that the plaintiff was an employee at will, sub-ject to dismissal at any time for any cause; that The Legal Aid Society is not an instrumentality of the state whose actions are governed by the civil rights laws; and that, even if the Society be adjudged an instrumentality of the state, nevertheless the dismissal was lawful, since plaintiff was discharged not for the act of making critical statements, but "because the contents of his statements and his actions, activities and temperament while he was on the staff of The Legal Aid Society reflected adversely on his suitability as an attorney on the staff of the Society."[3]

Without questioning the good faith of Lefcourt's efforts to achieve the crucial and important objective of improving the quality of defense of indigents in the courts in which he worked,[4] I find that the Society, also acting in good faith and with equal zeal for the welfare of its clients, discharged plaintiff lawfully. In reaching this determination I have concluded that Lefcourt was discharged as the result of an amalgam of acts of which his statements constituted a part, but only a part, and that his total behavior during the course of his employment with the Society was such as to permit the Society to decide in good faith that his service was not in harmony with the welfare of the organization.[5]

The mix of episodes which brought about Lefcourt's dismissal includes inci-

---

bor Relations Board, rather than this court. However, I do not and need not determine whether such claim is under the jurisdiction of the court or whether it has merit, since plaintiff appears to have withdrawn his claim, stating in his post-trial answering memorandum, p. 1:

"The argument regarding the Association of Legal Aid Attorneys and unfair labor practice in defendants' memorandum is misplaced since plaintiff submitted evidence regarding the said Association as relevant to the nature of the relationship between the plaintiff and the defendants and not as a claim regarding organization of a labor union."

In any event, based on the evidence produced at trial, I find as a fact that plaintiff's activities in the Association of Le-gal Aid Attorneys played no part in his eventual dismissal. It is perfectly clear from the record that many other attorneys, none of whom were discharged, participated equally with the plaintiff in the organization of the Association. Nothing in the record supports the proposition that Lefcourt, as distinguished from his fellow staff attorneys, was singled out to be discharged for this activity.

2. Pre-trial Order, pp. 5–6.

3. Pre-trial Order, pp. 6–7.

4. It should be noted, as well, that the Society stipulates that Lefcourt's legal competence is not in dispute.

5. One indication that Lefcourt was not fired solely for his statements or for his

dents which, objectively viewed and taken singly, are often insignificant but which, cumulatively, brought matters to the crisis of dismissal. I will review these episodes in a moment, but it should be noted that my findings of fact as to the reasons for discharge differ from the contentions of both parties. As stated above, plaintiff argues that he was discharged solely on account of his utterances, and I find that this was not so. On the other hand, defendants informed Lefcourt, at conferences held with him and his attorney after Lefcourt's dismissal, of a group of alleged items of malfeasance (several of which were knocked out of the "group" during the post-dismissal investigation), then ultimately advised the plaintiff that he had been dismissed for lack of judgment, and took the position at the trial (through its president) that Lefcourt was actually dismissed for lack of candor.

In view of the varying reasons for dismissal alleged by defendants, the barrage of material aired at trial as to Lefcourt's employment record, and the fact that at least three of Lefcourt's supervisors (Carr, Marra and Patterson) and perhaps a fourth (Adler) participated in either the dismissal or review process, each giving a different version of the reason for dismissal, the image created by the presentation of the facts is somewhat blurred. In studying the record, however, there emerges a picture of a frictional relationship developing during the course of his employment between Lefcourt and some of his superiors

which, capped by his strongly critical statements, caused those who were managing the Society, as I have said above, to conclude in good faith that Lefcourt's service was not in harmony with the welfare of the organization.

*Incidents Other than the Statements*

This class of episodes includes the following:

1) Objections by Lefcourt to what he mistakenly thought was the Society's acquiescence in court procedures by which defendants between the ages of 16 and 18 were arraigned in the same court part as adult prisoners, and Lefcourt's drawing up of a petition asking the Society to withdraw its consent to the practice.

2) Lefcourt's telephoning Adler on several occasions to ask for an extra week's vacation or a week's leave of absence without pay, in addition to his regular vacation. Whether justified or not (and Lefcourt disputes it), Adler described the calls this way:

"And he pressed me and pressed me—it was a very uncomfortable sort of thing, even though trivial—and I kept saying no * * *" (Tr. 407).

3) Lefcourt's requests to Adler to shift the date of his night court duty. As to these, Adler's version was that

" * * * with all of the efforts that I made to talk to him about it, he kept nagging and nagging." (Tr. 408–409).

4) Objections by Lefcourt (and Joseph Kaplan, his immediate superior in

---

activities in the Association is the fact that other attorneys, as junior as Lefcourt, have criticized Legal Aid and joined the Association and yet have not been discharged (e. g., Tr. 181). Plaintiff admits that many other members of the Legal Aid staff, senior and junior, have made statements substantially similar to Lefcourt's without being dismissed. However, the reason they were not discharged, plaintiff contends, is that Lefcourt's statements were the *only* such statements to come to the attention of the Society's superiors. This argument appears specious. Carr was certainly made aware of the

feelings of the other members of the Association when its Executive Committee, in Carr's presence, adopted and agreed with Lefcourt's statements. As for Marra, although he testified that he had never before heard any Legal Aid attorney say that his inability to spend enough time with clients would lead to increased antagonism by black defendants, Marra also said that he had heard all kinds of complaints in his 30 years with Legal Aid, including the complaint that the heavy caseload prevents Society attorneys from going into the full merits of a case. (Tr. 309–311).

Brooklyn) to his being transferred back from Brooklyn to Manhattan. Lefcourt claims Adler refused to give a reason for the transfer; Adler says that he did give a reason, but concluded conversations on the subject by stating: "Look, I don't have to give you any reason, and I have given you a reason." (i.e., the transfer was normal and one of many being made at the same time). (Tr. 411–412.)

5) Lefcourt's alleged behavior on June 3, 1968, his first day back in Manhattan, in laughing or chuckling in Adler's presence and saying, when he was assigned to Part 1–D, "Five lawyers for ten cases." When Adler asked Lefcourt what he meant, Lefcourt just turned and walked away. (Tr. 414.) Adler's reaction to what he considered Lefcourt's irritating behavior on this occasion is illuminated by the following colloquy at the trial:

> "THE WITNESS: Well, what kind of a kid is this who takes a look at the calendar and knows what's going on in 1–D when he hasn't been here for a couple of months and has no idea, and so his reaction to my saying, 'You go to 1–D' was extraordinary. I hadn't heard anything like it before and, I might say, nor since.
>
> "THE COURT: You felt it was small but significant, is that it?
>
> "THE WITNESS: I felt it showed a certain lack and it was sufficient enough for me to tell Mr. Marra about it." (Tr. 416.)

6) Lefcourt's request that he be given a day off to attend Senator Kennedy's funeral. This proposition was put to Marra, who, according to plaintiff, blew up at the question and said:

> " 'You have some nerve,' or words to that effect, 'asking for a day off. There are many people here who deserve it more than you do, and you can't have a day off and you have to be here tomorrow.' " (Tr. 67.)

Marra's version is different. He testified that Lefcourt said, "I want tomorrow off."

"And by the tone of his voice, it wasn't a request, it was a demand * * *. * * * because of the tone of his voice and the fact that I thought he was rather rude, I said to him, 'Somebody will have to be in tomorrow, and you are going to be one of them.' " (Tr. 267).

7) Lefcourt's alleged failure on some occasions to follow the instructions to report first to the office before 9:30 A. M. rather than going directly to court. (Tr. 355–356.)

### Lefcourt's Statements

During the week of June 3, 1968, shortly before plaintiff's discharge, plaintiff made a statement to Robert Kaplan as they were leaving the Manhattan Criminal Court Building. This is one of the two statements which Lefcourt claims constituted the basis on which he was fired in violation of his rights of free speech. Defendants contend, and Kaplan testified, that Lefcourt said that the way Legal Aid handles cases "foments black revolution." (Tr. 417; 450.) Lefcourt denies making the statement, and testified that he said that the inability of Legal Aid attorneys to spend more time with their clients was adding to the hostility these defendants already had towards the system and could have an impact in the ghettos. (Tr. 81.)

I find that it made no difference in law whether Lefcourt uttered the words testified to by Kaplan or by him. Even if Lefcourt's version was correct, when reported to his superiors (as it was) it would add substantial fuel to a fire ready to be lighted.

The climactic episode occurred June 10, 1968, the day plaintiff was discharged, and involved the second of the statements which Lefcourt claims brought about his discharge in violation of his First Amendment rights. On that day Lefcourt handled, under Ferraro's guidance (or Ferraro handled with Lefcourt standing by) a case on the calendar involving a charge of grand larceny. It appears undisputed that the Le-

gal Aid face sheet indicated a yellow sheet of two pages which meant that the defendant had some eight to fourteen prior arrests and dispositions. The face sheet also indicated that the defendant had admitted his guilt to the original interviewing Legal Aid attorney on the arraignment, as well as to the arresting police officer, although the defendant told each of them a slightly different version. Ferraro asked the defendant whether he had been warned of his rights, whether he wanted to plead guilty, and whether he had admitted his guilt to the Legal Aid attorney on arraignment. (Tr. 392.) Ferraro then arranged for the defendant to plead guilty to petit larceny (to which the defendant consented), and the defendant ultimately received a seven-months sentence. (Tr. 68–71; 362–374; Deft's Ex. B.) There is some dispute as to whether both sides were discussing the same case of grand larceny. Nevertheless, whatever the precise facts, it is quite clear that Lefcourt became "furious" (Tr. 71) at what he considered to be Ferraro's malfeasance in handling the plea. Indeed, the substantially uncontested expert testimony of Sam Dawson, a Legal Aid attorney who has tried several thousand cases, was to the effect that Ferraro's examination of the defendant had been inadequate and had overlooked several important constitutional, statutory and factual issues. It was apparently this alleged mishandling of the case that caused Lefcourt to become incensed and to make his comment to Ferraro about pleading clients guilty. Ferraro testified that Lefcourt said in substance:

> " ' * * * once this defendant admits his guilt, that's it, we go ahead and plead him guilty, we don't do anything for him. * * * even though these guys are guilty, we still should take it to trial. Maybe we can beat the case. * * * You never see private counsel pleading clients guilty the way we do.' " (Tr. 357–358.)

Plaintiff, on the other hand, contends that he told Ferraro:

> "The mere fact that a defendant admits his guilt is no reason to plead him guilty." (Tr. 71.)

As in the case of Lefcourt's statement of June 3rd, I find that it made no difference in law whether Lefcourt uttered the words testified to by Ferraro or by himself. It is clear, however, that whichever version of his statement is correct, it added the ultimate fuel to the kindling fire.

### The Questions of Law

■ Although Lefcourt was not dismissed solely because of his critical statements, there is no dispute that the statements (or, as the defendants put it, the contents of the statements) played a part in the decision to discharge him. Consequently, it becomes necessary to deal with Lefcourt's contention that he had a right to make such statements and that the Society had no right to discharge him in connection with such statements. Lefcourt admits that he was hired at will and that a private employer would, under the state law applicable to such an employer, have the right to discharge him without cause. He argues, however, (1) that his discharge by the Society constituted "state action," and (2) that since the Society as a state instrumentality deprived him of his rights under the Constitution within the meaning of 42 U.S.C. § 1983, the court has jurisdiction under 28 U.S.C. §§ 1331(a), 1343(3) and (4). In support of his claim that the Society is a state instrumentality, Lefcourt relies on the fact that a very substantial portion of the budget of The Legal Aid Society is furnished by the State of New York and the City of New York (and a smaller amount by the federal government, but this would not render the Society a state instrumentality), and on the contention that the Society and its lawyers are engaged in the performance of a "constitutionally required function of the state."

The Society strongly disputes its proposed classification as a state instru-

mentality, relying not only on such cases as Powe v. Miles, 407 F.2d 73 (2d Cir. 1968), and Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S. D.N.Y.1968), for the proposition that such a classification is not to be based alone on the percentage of public funds received, but also on the argument that, even if the service performed for indigent defendants be regarded, arguendo, as state action, nevertheless the relationship between the Society as employer and its employees is private and not public.

I find it unnecessary to reach a determination as to whether the Society can, in the present factual context, be classified as an instrumentality of the state, since it is my conclusion that even if it were so regarded, it nevertheless had the right to dismiss Lefcourt on the basis of the facts as I have found them.

Plaintiff's legal rationale that the Society, if regarded as a public instrumentality, would not have the right to dismiss him for the statements he made, is based on the following propositions: (1) An employee of government cannot, as such, be deprived of the right of free speech of an ordinary citizen; (2) Under Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), state instrumentalities do not have the right to dismiss an employee for statements made by such employee criticizing the manner in which the employer conducts its affairs.

■ There can be no argument with plaintiff's first proposition. Clearly such cases as Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L. Ed.2d 629 (1967), Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), and Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), establish that public bodies cannot withhold or revoke such privileges as they are authorized to confer (including public employment) because the applicant for or holder of the privilege makes statements disagreeable or inimical to or critical of the public body. Nor is there

any disagreement that *Pickering* widened the swathe previously cut by the Supreme Court in the protection of a public employee's right of free speech. The question therefore narrows itself to a determination as to whether the instant case falls within the circumstances and rationale of *Pickering*, and plaintiff's case must stand or fall on that determination. I find that *Pickering* does not apply in the circumstances of this case and that plaintiff's claim must fall.

Pickering was a teacher who was dismissed for writing and publishing in a newspaper a letter criticizing the allocation by his employer, a Board of Education, of school funds between educational and athletic programs, as well as the Board's methods of informing or preventing the informing of the school district's taxpayers as to why additional tax revenues were being sought. In holding that Pickering could not be dismissed because of the statements he made, the Court observed:

"The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." (391 U.S. supra, 569–570, 88 S.Ct. 1735).

And further (at 572–573, 88 S.Ct. at 1737):

"What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's

proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public."

And finally (at 574, 88 S.Ct. at 1738):

"However, in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be."

The Supreme Court in *Pickering* specified that its ruling was predicated on the special facts of that case. As the Court stated at 569, 88 S.Ct. at 1735:

"Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run."

 Here, the factual situation varies substantially from *Pickering*. In *Pickering*, the statements "are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work." (569–570, 88 S.Ct. 1735.) Quite the contrary was true of Lefcourt. In *Pickering*, there was "no question of main-taining either discipline by immediate superiors or harmony among coworkers." (570, 88 S.Ct. 1735.) Here, the question of maintaining discipline and harmony was at the heart of the matter. In *Pickering*, "[a]ppellant's employment relationships with the Board * * * are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." (570, 88 S.Ct. 1735.) In Lefcourt's case, his relationships with his superiors were precisely "the kind of close working relationships" which rendered "personal loyalty and confidence * * * necessary to their proper functioning."

As the *Pickering* Court commented (570, n. 3, 88 S.Ct. 1735):

"Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine *the effectiveness of the working relationship* between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that *significantly different considerations* would be involved in such cases." (Emphasis added.)

 In *Pickering*, the employee's criticisms of his employer were neither shown nor can be presumed to have "impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." (572–573, 88 S.Ct. 1737.) In Lefcourt's case, his statements had a definite impact on the internal operation of the Society, and the Society could in good faith presume that Lefcourt's behavior would continue to have such an impact. The relationship between Lefcourt and several of his superiors devolved into a rather sharp personality conflict. In defendants' eyes, at least, plaintiff's con-

duct on several occasions approached borderline insubordination, for, although he never ultimately disobeyed his superiors' orders, he very infrequently carried them out without question. Whether in fact plaintiff was as obstinate and unyielding as defendants suggest is impossible to determine from the beclouded record. What is clear, however, is that defendants believed that he was, and that there is no reason to find that this belief was conceived in other than good faith. Such honestly held feelings of antagonism and distrust would hardly promote the efficiency and harmony of the organization. Disharmony within a relatively small organization dependent for its success upon the confidence and close working relationship of its co-workers and superiors could severely disrupt the smooth functioning of this critical organization and divide its members into separate camps. While the courts must scrupulously protect public employees against incursions upon their First Amendment freedoms and vigilantly ferret out government attempts to mask constitutionally impermissible discharges behind the cloak of disharmony and inefficiency, I find no such unconstitutional intrusion or deception present in the instant case. The personal antipathy existing between Lefcourt and a number of his superiors was clearly not imaginary and gave positive signs of generalizing throughout the staff. Indeed, such ill will was undeniably evident at the trial in the demeanor of witnesses on both sides. While it is certainly true that "government has no interest in preventing the sort of disharmony which inevitably results from the mere expression of controversial ideas," and while it is equally true that government may not require its employees to be "unthinking 'yes men' who will uniformly adhere to a designated side of any controversial issue or * * * thinking individuals sworn never to

share their ideas with one another," Los Angeles Teachers Union, Local 1021, Am. Federation of Teachers v. Los Angeles City Board of Education, 78 Cal. Rptr. 723, 729, 455 P.2d 827, 833 (1969), instances will surely arise, such as here, where harmony among public employees becomes not only a legitimate, but a necessary employer objective. Especially is this true in the case at hand. The Legal Aid Society is charged with the defense of the criminal indigent. In so doing, it is performing a function constitutionally required of the state by the Sixth Amendment. The Society depends for its effectiveness on the close cooperation and unfettered communication (often confidential) of its staff and superiors. When ill will and hostility threaten to choke off this intimate interaction, the real loser is the indigent defendant himself.

■ Finally, it should be observed that the *Pickering* decision protected a public employee's right to join in public debate, whereas Lefcourt's statements formed no part of public debate. This is not to say, of course, that *Pickering* or other cases hold that a public employee has no right to join in free and open discussion within his own organization as to the problems which it faces. However, the rights of the public employee to join in such private discussions can be limited by the state, as employer, where they result in internal friction inimical to the welfare of the organization. Even as to public debate, the Court in *Pickering* observed:

> "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (391 U.S. 568, 88 S.Ct. 1734–1735.)[6]

---

6. Note also the recognition of the state's interest as employer referred to in the recent opinion of the United States Court of Appeals for the Second Circuit in Uni-
formed Sanitation Men Association, Inc., et al. v. Commissioner of Sanitation of City of New York, et al., 426 F.2d 619 (1970) where the observation was made

Indeed, the instant case appears to fall more naturally within the parameters of Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968). There a former employee of the Canal Zone who had printed and distributed a contemptuous and defamatory lampoon of the governor was discharged. His suit seeking reinstatement claimed the dismissal to be unlawful on the ground, among other reasons, that it violated his assured freedom of speech. In rejecting his claim, the court wrote (at 832–833):

"Courts are increasingly re-examining and considering the issue whether and to what extent the Government's prerogative to employ or discharge permits it to regulate conduct of its employees that would, in the absence of the employment relationship, be protected from interference by the First Amendment. As Government services multiply, the liberties of Government employees come to be the liberties of an increasing and substantial portion of the citizenry, and are accordingly given increased recognition. There is a reverse side to the coin: With mounting provision of increased and increasingly indispensable services rendered by Government employees, the public weal demands administration that is effective and disciplined, and not beset by turmoil and anarchy.

"We do not approve the apparent premise of the Appeals Examining Office that an employee of the Government cannot claim the right to both a Government job and freedom of speech. One who enters the routine service of the Government cannot be forced to cede all of his protections from Governmental excesses. Whatever liberties a private employer might have or take, the Government cannot disregard the Bill of Rights merely by calling on its prerogative to hire and fire employees. The Constitutional climate of today is different from that of 1892 when Justice

Holmes struck off his oft-quoted phrase.

"Government employees do, to some extent, have 'lesser rights' than others have under the Constitution, since they may be required to suspend or refrain from certain activities (e.g., political campaigning) that are embraced within the constitutional rights of others, when such activities are reasonably deemed inconsistent with their public status and duties. See United Public Workers [of America (C.I.O.)] v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). But in some aspects at least, their constitutional rights are inviolable notwithstanding their status as Government employees.

\* \* \* \* \* \*

"On the other hand we do not agree with appellant that an employee may, without fear of discipline, say anything and anywhere whatever a private person may say without fear of a libel action, under the doctrine of *New York Times*. The added interests of the sovereign as employer are factors to be considered in adjusting and balancing constitutional concerns.

\* \* \* \* \* \*

"Free and open discussion within an agency of Government is different from heated debate flowing into the public arena. While a free society values robust, vigorous and essentially uninhibited public speech by citizens, when such uninhibited public speech by Government employees produces intolerable disharmony, inefficiency, dissension and even chaos, it may be subject to reasonable limitations, at least concerning matters relating to the duties, discretion, and judgment entrusted to the employee involved. There is a reasonable difference between the kind of discipline and limitation on speech the Government may impose on its employees and the kind it may impose on the public at large.

that "[i]n a case like this the state is asserting not its interest in the enforce-

ment of the \* \* \* law but its 'legitimate interest as employer.' "

To ensure a basic efficiency in public service a limitation may be imposed as a condition of Government employment that is broader than the standard that defines the wrongdoing that subjects a private citizen to penalty or damage action.

"In our view appellant's conduct in printing and beginning distribution of the letter and poem was a legitimate basis for discharge to promote the efficiency of the service."

\* \* \* \* \* \*

This opinion commenced with the observation that the current case illustrates the "agonizing difficulties" faced by those concerned with the proper representation of indigent defendants in cruelly overcrowded metropolitan criminal courts. It is important to observe that the finding that the Society lawfully dismissed Lefcourt does not disparage the efforts which his statements represented to improve the quality of legal service rendered to such indigent defendants. Nor is there any reason to believe that the Society does not have these objectives equally at heart. The problem is real and acute, and no solution will be found short of massive efforts on the part of all concerned with the administration of criminal justice and renewed massive moral and financial support by the public at large. The urgency of the matter is illustrated by the material set forth in the Appendix to this opinion.

For the reasons stated above, the plaintiff's complaint is dismissed.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion constitutes the court's findings of fact and conclusions of law.

## APPENDIX

On May 3, 1970, the Presiding Justices of the Appellate Divisions, First and Second Departments, of the State of New York issued a statement in connection with a reorganization of the work of the Criminal Courts reading, in relevant part, as follows:

"During the past several months, each of the city's three major newspapers has called attention to the serious problems in processing an overwhelming number of cases in the Criminal Court of the City of New York. These problems are manifested by an increasing backlog of cases, longer delays in processing cases to disposition, and inadequate attention to individual cases and individual defendants.

"The conditions in the Criminal Court of the City of New York are not unlike those in other large city criminal courts. In a 1967 report, the President's Commission on Law Enforcement and Administration of Justice found that 'conditions of inequity, indignity, and ineffectiveness' are widespread in the nation's lower courts. Finding 'oppressive workloads' and shortages of personnel and facilities, the Commission observed:

'The deluge of cases is reflected in every aspect of the court's work, from overcrowded corridors and courtrooms to the long calendars that do not allow more than cursory consideration of individual cases.'

"The Commission recommended the allocation of resources to the courts and 'business management techniques, including the use of data processing equipment \* \* \*'

"The Appellate Divisions, First and Second Departments, given responsibility by law for the administration of all courts in New York City, recognize the existence of these deplorable conditions in the New York City Criminal Court, and, together with Supreme Court Justice Edward R. Dudley, the Administrative Judge of the court, will continue to strive for improvement.

\* \* \* \* \* \*

"Unfortunately, there are no simple or inexpensive solutions to improve conditions in the court. The courts and the public agencies which comprise the court complex need massive financial assistance. Each of the agencies must be suitably staffed to

enable cases to be processed smoothly through the court system. The courts also need additional funds and technical assistance if modern business management techniques are to be applied to the judicial system.

\*　　\*　　\*　　\*　　\*　　\*

"The late Presiding Justice Beldock at a meeting of the Legal Aid Society on March 12, three days before he died, observed that assistance in obtaining necessary funds should be rendered by members of the legal profession. He stated:

'You have the muscle—the courts are generally not a priority agency —it seems that wherever we look we have to struggle for what we get —there are not sufficient correctional officers, probation officers and there is a shortage of court clerks and attendants—the personnel shortage also afflicts Legal Aid—all services are tied together by a chain reaction.'

"Now that the operations of the Criminal Court have been given such widespread attention, we echo Justice Beldock's sentiments and call on the public-at-large and the press to assist us in securing the help we need to make the courts operate as fairly and effectively as they should."