629 F.2d 809
 Michael I. SELZER, Plaintiff-Appellee,
v.
Martin FLEISHER, David W. Abbott, Nathan Schmukler, Donald
R. Reich, John W. Kneller, and Harold M. Jacobs, Chairman,
and Edith B. Everett, Ronald T. Gault, Jack John Olivero,
David Z. Robinson, Patricia Carry Stewart, Loretta A.
Conway, Walter H. Crowley, Armand D'Angelo, Gurstin D.
Goldin, Albert V. Maniscalco, David Valinsky, Emanuel R.
Piore, Joan B. Maynard, Joaquin Rivera and Edward A.
Roberts, Members of the Board of Higher Education of the
City of New York, and Robert J. Kibbee, Chancellor of the
City University of New York, Defendants;
Morton Berkowitz, Michael Kahan, Philippa Strum, Herbert
Weiss, Ellen Frey- Wouters, Robert Engler and The
Board of Higher Education of the City of
New York, Defendants-Appellants.
 No. 1030, Docket 79-7776.
 United States Court of Appeals,
Second Circuit.
 Argued March 21, 1980.
Decided Aug. 6, 1980.
 
 1
 Donovan, Leisure, Newton & Irvine, New York City, New York (Walter L. Stratton, G. Russell Miller, E. Lauren Holmes, New York City, of counsel), for plaintiff-appellee.
 
 
 2
 Allen G. Schwartz, Corp. Counsel, New York City (L. Kevin Sheridan, Diane R. Eisner, Richard Bowers, Patrick F. X. Mulhearn, Peter J. Kurshan, New York City, of counsel), for defendants-appellants.
 
 
 3
 Before KAUFMAN and TIMBERS, Circuit Judges, and LASKER, District Judge.*
 
 
 4
 LASKER, District Judge.
 
 I.
 
 5
 During the fall of 1977, Michael Selzer, then a political science professor at Brooklyn College, was denied tenure and promotion. He brought this action against various individuals and the New York City Board of Higher Education, alleging that the defendants acted to cause the denial because of his contacts with the United States Central Intelligence Agency (CIA) in violation of his First Amendment rights of freedom of expression and association.
 
 
 6
 Selzer had been enthusiastically recommended by the appropriate committees in the political science department and the School of Social Science for promotion from Assistant to Associate Professor in the Spring of 1976. Selzer, who specializes in the area of psychopolitics and was then studying the psychology of Nazi leaders, had contacted the CIA to inquire about access to data possessed by that agency, and agreed to the CIA's request to "debrief" him after he returned from a research trip to Europe in the summer of 1976. Upon his return, in a telephone conversation which lasted ten to fifteen minutes, Selzer gave a CIA officer information as to his observations on his trip.
 
 
 7
 Selzer's action became known to other members of the political science department during the Fall of 1976 and to the press that winter. In May 1977, the Appointments Committee of the political science department voted to deny Selzer tenure, and the department's Promotions Committee, in contrast to their 1976 action, voted against his promotion. The 1977 report of the chairman of the department also recommended against granting Selzer tenure. At each level of the hierarchy of committees at Brooklyn College involved in the tenure and promotion processes, the subsequent votes were against Selzer. Finally, the President of Brooklyn College decided not to recommend to the Board of Higher Education that Selzer be tenured, thereby terminating the process.
 
 
 8
 Selzer alleged that the negative votes on his tenure and promotion candidacies were based not on his academic qualifications but on his association with the CIA, and that the individual defendants conspired to deny him tenure. The appellants claimed that they were merely expressing their views as to Selzer's involvement with the CIA and that their actions were not intended to punish him for the exercise of his First Amendment rights.
 
 
 9
 After a nine week trial the jury returned a verdict for $580,000 against six individual defendants who sat on the tenure and promotion committees of the political science department. The other defendants were found to have acted in good faith. In response to special interrogatories, the jury found that the plaintiff proved that his association with the CIA was "a substantial or motivating factor in the determination to deny (him) tenure or promotion"; that the defendants as a group had not shown that without such association Selzer would have been denied tenure or promotion; and that the six defendants-appellants who had caused or contributed to the denial of Selzer's tenure or promotion had not acted in good faith.
 
 
 10
 After trial the district judge entered a judgment for the amount awarded by the jury together with an award of $433,458.73 in attorneys fees and expenses, and $60,065.83 in costs. The judgment was modified to substitute the Board of Higher Education as judgment debtor in lieu of the six individuals. The Board and those individuals have appealed to this Court.
 
 II.
 
 11
 Appellants claim several errors below. We deal at the outset with those claims which we find without merit.
 
 
 12
 Appellants argue first that the First Amendment precludes recovery against them because the imposition of damages punishes them for engaging in what they characterize as "pure speech," that is, for merely expressing their views about Selzer's CIA involvement. This contention is based on an inaccurate characterization of the facts. The jury found appellants' conduct caused and was intended to cause the deprivation of Selzer's constitutional rights. Clearly, the First Amendment does not shield such conduct.
 
 
 13
 Appellants also contend that since the actual decision as to tenure was made by the President of Brooklyn College alone, the actions of the members of the Tenure and Promotion Committees could not have proximately caused Selzer's injury.[1] However, the jury was properly instructed as to the principles of causation and concluded that appellants' actions were a proximate cause of the denial of Selzer's tenure. There was sufficient evidence to support that finding, including the testimony as to the weight given to the votes particularly when negative of the Tenure and Promotion Committees of the department by those who participate in the upper levels of the multi-tiered decisionmaking at Brooklyn College. See Haimowitz v. University of Nevada, 579 F.2d 526, 530 (9th Cir. 1978).
 
 
 14
 Appellants claim that, as a matter of law, they are entitled to good faith immunity under Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), because without any prior judicial decision holding similar conduct to be actionable, they had no reason to know that they were violating Selzer's constitutional rights. We disagree. A prior judicial decision holding conduct such as appellants' to be a basis for suit was not necessary to apprise them of a rule which should come as no surprise, that is, that conduct which denies a person promotion or tenure because of his private associations violates his First Amendment rights and is accordingly actionable.
 
 
 15
 Appellants contend that two evidentiary rulings of the court below constituted reversible error: (1) the court's refusal to admit into evidence two outside evaluations of Selzer's scholarship during cross-examination of defendants (who testified that they relied on those evaluations in deciding to vote against Selzer's tenure or promotion), and (2) the exclusion of the evaluations of certain Brooklyn College political science professors who were colleagues of Selzer. The evaluations were prepared by Selzer's expert and fact witness, Professor Dankwart Rustow, and were as laudatory of the other professors as Rustow's evaluation of Selzer.
 
 
 16
 Appellants argue that the admission of these reports would have demonstrated to the jury the undependability of Rustow's praise of Selzer. These rulings did not constitute an abuse of the trial judge's discretion. Viewing the record as a whole, the trial court's determination, although disappointing to appellants, did not prejudice them. As to the first item, the evaluations in question were admitted in evidence later in the trial, and during summation defense counsel had the opportunity to argue their significance to the jury. As to the second, the materials offered were of marginal relevance. Moreover, although the evaluations were not admitted, defense counsel were permitted the functional equivalent of questioning Rustow about his evaluations of other professors. (Tr. 4552)
 
 
 17
 Appellants next claim that the district judge erred by failing to charge the jury as to when Selzer's due process rights attached. However, Selzer did not claim he was denied his due process rights but that his First Amendment rights had been violated, and those rights did not "attach" at a specific time. Accordingly, the charge urged by appellants would have been inappropriate.[2]
 
 
 18
 We also find to be without merit the contention that the court's charge was insufficient on the subject of Selzer's duty to mitigate damages. Appellants argue that although the judge instructed the jury that,
 
 
 19
 "It is the duty of any person who has been injured to use reasonable diligence and reasonable means under the circumstances to prevent the aggravation of such injuries and to effect a recovery therefrom."
 
 
 20
 (Tr. 6306-07), it was erroneous to refuse to charge the particulars of the responsibility to mitigate. Selzer responds that defendants failed to meet their burden of introducing evidence showing that he did not attempt to mitigate, and that therefore, "probably no charge on mitigation at all was proper." We agree that the charge given was sufficient to apprise the jury of Selzer's duty to mitigate. Without evidence in the record showing that Selzer did not attempt to find employment elsewhere, a further charge was not necessary.
 
 
 21
 Appellants assert that the trial judge's conduct was so biased and prejudicial as to deny them a fair trial. While it is understandable that in such a lengthy and controversial trial, the parties may become convinced that the judge was not acting impartially, our review of the record convinces us that the district judge's rulings and behavior were unbiased and that the trial was fairly conducted.III.
 
 
 22
 We turn to the dispositive issue on this appeal.
 
 
 23
 Appellants claim that the trial court's charge was erroneous in failing to instruct the jury that the principles established in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) applied to each defendant individually.
 
 
 24
 In Mt. Healthy, the plaintiff, a school teacher, alleged that he was not rehired because of a telephone call he had made to a local radio station concerning a dress code for teachers. The district court found the telephone call to be protected by the First and Fourteenth Amendments and that it had played a " 'substantial part' " in the Board's decision not to renew Doyle's employment. Accordingly, it held the plaintiff entitled to reinstatement and backpay. The Supreme Court agreed that the call was constitutionally protected, but vacated and remanded because of the failure to apply the appropriate rule of causation. The Court held that:
 
 
 25
 "(i)nitially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct."
 
 
 26
 Id. at 287, 97 S.Ct. at 576 (footnote omitted).
 
 
 27
 In the case at hand, the trial court instructed the jury that:
 
 
 28
 "If you find that the plaintiff has met (his) burden of proof, then you must determine whether the defendants have shown by a preponderance of the evidence that the plaintiff would have been denied tenure and promotion even if plaintiff's association with the C.I.A. had not been considered."
 
 
 29
 (Tr. 6278).
 
 
 30
 The judge then put the following special interrogatory to the jury:
 
 
 31
 "Did the defendants prove by a preponderance of the evidence that Michael Selzer would have been denied tenure or promotion even if his association with the CIA had not been considered?"
 
 
 32
 (App. 119). The jury answered in the negative.
 
 
 33
 The appellants argue that the charge given was good as far as it went but did not go far enough. They claim that the interrogatory put to the jury was deficient in not asking it to determine whether, as to each defendant, his or her decision to recommend against plaintiff's tenure or promotion would have been made even if Selzer had not associated with the CIA. Put another way, the appellants claim that the jury instruction and the special interrogatory actually given were erroneous because they inquired solely as to the collective actions of the defendants and failed to distinguish the cases of individual defendants. Consequently, they argue, it is impossible to determine whether, if asked, the jury would have concluded that a particular appellant would have acted to cause Selzer's tenure or promotion denial absent his collaboration with the CIA.
 
 
 34
 Selzer replies that findings as to each defendant are not required for a finding of liability. He contends that Mt. Healthy established a test only as to whether the wrongful conduct brought about the alleged injury and has nothing to do with who acted wrongfully.
 
 
 35
 We agree with the appellants that the charge and interrogatory were insufficient in the circumstances of this case. It is true that Mt. Healthy involved only one defendant and that the court did not specify the language to be used in multi-defendant cases. However, there is nothing in the Court's opinion that indicates that the test should not be applied to each defendant individually. To the contrary, the Court's reasoning, which relies primarily on the nature of the decision-making process of "those responsible for the decision to rehire," requires the separate application of the test to each defendant.
 
 
 36
 "A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."
 
 
 37
 429 U.S. at 285-86, 97 S.Ct. at 575. We conclude that the Mt. Healthy rule of causation is applicable to each defendant separately and cannot be satisfied by a finding as to the defendants collectively.
 
 
 38
 Accordingly, we hold that each defendant should have been given the opportunity to establish by a preponderance of the evidence that absent Selzer's CIA involvement that defendant would nevertheless have acted in the same way. The failure to charge and interrogate the jury on that point is reversible error.
 
 IV.
 
 39
 Appellants challenge as excessive the trial court's award of attorneys fees in the amount of $433,458.73.[3] In the event that the trial court is again called upon to fix attorneys fees, we are confident it will note, as this Court has recently suggested in Seigal v. Merrick, 619 F.2d 160, 164, Nos. 79-7420, 79-7444, (2d Cir. 1980), that any award must be proportionate to the result achieved.
 
 
 40
 The judgment of the district court is vacated and the case remanded for a new trial.
 
 
 41
 KAUFMAN, Circuit Judge (concurring in part and dissenting in part):
 
 
 42
 I concur in the majority's decision to reverse the judgment entered for Selzer in the district court,[1] but I emphatically dissent from its decision to remand the case for a new trial. In my view, the majority simply assumes, without deciding, that Selzer's activity is protected by the first amendment.[2] Since a fuller assessment of the conflicting interests here at issue demonstrates that Selzer's conduct does not merit constitutional protection, I am forced to conclude that the question of appellants' liability should never have been presented to the jury. Accordingly, I would reverse the judgment for the appellee and dismiss the complaint.
 
 
 43
 Although not expressly set forth in the Constitution, a right of free association has been implied from the freedoms of speech, assembly, and petition explicitly guaranteed by the first amendment. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971). Like these express guarantees, however, the right to associate freely is not absolute, particularly where its exercise conflicts with the duties and responsibilities of a governmental employee. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
 
 
 44
 In Pickering a public high school teacher was dismissed for publishing a letter in a local newspaper critical of the budget adopted by her employer, the board of education. After balancing the interest of the teacher, as a citizen, in her expression, with the interest of her employer in promoting the efficiency of the public services it performed, the Court concluded that the teacher's interest in free expression outweighed the school board's asserted interest in preserving harmonious relations between faculty and administrators. Pickering, supra, 391 U.S. at 569-74, 88 S.Ct. at 1735-1737. See also Givhan v. Western Line Consolidated School District, 439 U.S. 410, 414, 99 S.Ct. 693, 695-696, 58 L.Ed.2d 619 (1979); Mt. Healthy City School District v. Doyle, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). In striking the proper balance in future cases, however, the Court clearly suggested that a contrary result would follow if it were shown that an employee's actions actually disrupted close working relations between members of the employer's staff. Pickering, supra, 391 U.S. at 570 n.3, 88 S.Ct. at 1735 n.3.
 
 
 45
 In applying the guidelines laid down by Pickering, the courts of this Circuit have looked principally to the disruptive impact of an employee's conduct or speech upon his co-workers. In Lefcourt v. The Legal Aid Society, 312 F.Supp. 1105 (S.D.N.Y.1970), aff'd, 445 F.2d 1150 (2d Cir. 1971), a Legal Aid attorney contended that he had been illegally discharged by the Society because he had been openly critical of his supervisors' policies. In rejecting Lefcourt's assertion that his criticisms enjoyed constitutional protection, Judge Lasker noted that the attorney's statements had adversely affected the internal operations of his employer, and could reasonably be presumed to continue to do so in the future. Lefcourt, supra, 312 F.Supp. at 1112. Since the Society depended "for its effectiveness on the close cooperation and unfettered communication (often confidential) of its staff and superiors," Judge Lasker concluded that the ill-will and disharmony sparked by Lefcourt's criticisms generated a sufficiently important interest in his employer to justify his dismissal. Id. at 1113. See also Simard v. Groton Board of Education, 473 F.2d 988 (2d Cir. 1973).
 
 
 46
 The importance of a governmental employer's interest in maintaining harmonious, effective working relationships among its employees was only recently emphasized by this court in Janusaitis v. Middlebury Volunteer Fire Department, 607 F.2d 17 (2d Cir. 1979). Janusaitis, a Connecticut firefighter, repeatedly criticized his superiors for mismanagement of the department. A protracted squabble ensued, which finally culminated with Janusaitis's dismissal after he publicly accused town officials of an illegal cover-up. Noting the distinction between the rights of an employee, such as Pickering, who merely expressed her views on the public policies and services of her institutional employer, and the rights of one, such as Janusaitis, whose conduct directly threatened his relations with his immediate colleagues and superiors, we rejected the contention that Janusaitis's charges were deserving of constitutional protection. "Carping criticism and abrasive conduct," we said, "have no place in a small organization that depends upon common loyalty (and) 'harmony among coworkers.' " Id. at 26 (citation omitted).
 
 
 47
 Though the actual impact of an employee's actions upon his colleagues is an important consideration in the balance to be struck, it cannot be accorded dispositive weight. Any number of private associations or expressions may in fact disrupt a small, homogeneous office, or incur the hostility of one's co-workers. But the subjective predilections of a majority of the employees ought not be permitted to justify the imposition of a stifling regime for the remainder. Rather, courts must also consider the intensity of the reaction, its likelihood of recurrence, and especially the degree to which the activities for which the employee claims protection necessarily affects the proper discharge of his professional responsibilities. The President's National Security Advisor obviously can claim no constitutional right both to serve in his sensitive position, and to moonlight as a newscaster. A postal employee, however, may well have a right to just such an association with the media, particularly where he occupies no position of high trust. In short, courts must determine whether the employee's association is antithetical to the performance of his duties, and to those of his colleagues.
 
 
 48
 In the instant case, there can be no doubt that Selzer's involvement with the CIA was directly relevant to his application for tenure. Since Selzer had evidently decided to exchange information, covertly, with an intelligence agency, other members of the faculty could reasonably question his commitment to the academic endeavor. Though it may well be debatable whether the course Selzer chose advanced scholarly objectives, there can be no doubt that his decision to pursue such a course was relevant indeed critical to an informed appraisal of his qualifications for permanent appointment to the faculty. After all, Brooklyn College was seeking a teacher and a scholar, not an espionage agent.
 
 
 49
 That Selzer's association with the CIA in fact disrupted the orderly operation of the College and particularly its Political Science Department cannot be gainsaid. From the moment word of Selzer's involvement with the agency first circulated among Department members until a decision upon his tenure application was finally reached, it appears the Department transacted little other business than to deal with the tempest created by his activities.
 
 
 50
 But more to the point, Selzer's conduct was inherently disruptive. Professional respect and mutual trust are essential to the vitality of an intellectual community. The unrestrained interchange of ideas, so necessary for the advancement of human knowledge and understanding, presupposes a commonality of scholarly purpose as well as a willingness to extend, and keep, confidences. By associating with the CIA, Selzer cast doubt upon his scholarly goals and principles. The nature of his association contravened what many colleagues considered to be an acceptable norm of academic behavior, and its likely effect was to inhibit them in their relations with him. Moreover, in refusing to disclose the manner and extent of his involvement with the agency, even after his CIA contact had expressly advised him that he was free to do so, Selzer exhibited a disturbing reluctance to share, and keep, personal confidences. Particularly where, as here, the very nature of his association posed an obvious threat to the scholarly pursuits, both of the College and of his colleagues,[3] Selzer's obstinate refusal to discuss his involvement with the agency evidenced a disdain for his peers that quite naturally evoked in them a similar aversion for him. Although the Department's agitated response was by no means beyond reproach, it was certainly predictable. This is particularly so in view of the "critical importance" of the tenure decision that was about to be made See Simard, supra, 473 F.2d at 996.
 
 
 51
 Courts, of course, must stand ever vigilant lest public employers attempt to mask unwarranted inroads upon an employee's constitutional freedoms under the rubric of disharmony and employee dissension. In the instant case, however, I fail to see how Selzer's conduct could be anything but disruptive and counterproductive to the legitimate ends of his employer. In such circumstances, I believe the appellants' strong interest in preserving collegiality and productive relationships among the Brooklyn College faculty must carry the day, particularly if the goal of affording students a challenging, uninhibited education is to be realized. Accordingly, I would reverse the judgment for Selzer and dismiss the complaint.
 
 
 
 *
 Hon. Morris E. Lasker of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 It might be argued, although appellants do not, that the jury charge misstated the law as to causation by setting too low a level of proof required for liability. The jury was charged
 "before you can find liability against these defendants, you must find that it was their actions that caused or contributed to the denial of tenure and/or promotion."
 (Tr. 6280) (emphasis added). While, in our opinion, this language casts too broad a net and should have omitted the italicized phrase, it does not constitute reversible error in light of the other instructions given the jury which correctly stated the test for causation established in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977):
 "In order to prove his claim the plaintiff must show by a preponderance of the evidence that his association with the C.I.A. was a substantial or motivating factor in the decision to deny him tenure and promotion."
 (Tr. 6278). Moreover, by special interrogatory which was answered affirmatively, the jury was asked
 "Did plaintiff prove, by a preponderance of the evidence, that his association with the CIA was a substantial or motivating factor in the determination to deny plaintiff tenure or promotion?"
 
 
 [2]
 Appellants assert that violation of Selzer's due process rights was made an issue in the case by repeated references to those rights by Selzer's counsel during trial. However, the jury was neither charged on the subject, asked to determine, nor did it determine whether Selzer's right to due process had been violated by the procedures used in arriving at the tenure or promotion decisions
 
 
 [3]
 Appellants also argue that no attorneys fees should have been awarded because Selzer's counsel agreed to represent him without a fee and he would not have been deterred from pressing his claims without an assurance of payment of his attorneys fees. We find no merit in this contention
 
 
 [1]
 Where, as here, a disappointed candidate for tenure seeks money damages, and not reinstatement, from those individuals who considered his qualifications and participated in the decision to deny his application for tenure, I fully agree with the majority that each defendant must be accorded an independent opportunity to prove that he would have voted to deny tenure even if the plaintiff's protected conduct or speech had not entered into his consideration. Determination of which, if any, of the defendants would have voted to deny tenure despite the plaintiff's protected activity should not end the inquiry, however. Rather, the trier should then proceed to determine whether there would have been sufficient opposition to the application, untainted by improper considerations, to have caused the denial of which the plaintiff complains
 
 
 [2]
 The district court also failed to resolve whether Selzer possessed a protected interest in his association with the CIA. Following presentation of the appellee's case, appellants moved to dismiss the complaint arguing, inter alia, that Selzer had failed to demonstrate that his involvement with the CIA merited constitutional protection. The district court rejected this argument, stating that the question presented an issue for the jury. But, when the district judge submitted the case to the jury, he neglected to instruct it to determine whether Selzer's association with the CIA merited constitutional protection. In any event, the question presents an issue of law for resolution by the court, and not the jury. See Bernasconi v. Tempe Elementary School District No. 3, 548 F.2d 857, 862 (9th Cir. 1977)
 
 
 [3]
 Before Selzer first contacted the CIA, he asked a colleague in the Political Science Department, Herbert Weiss, for the names of individuals in Europe who might assist him in his research into Nazi war collaborators. Weiss gave Selzer the name of a close friend in Belgium. Subsequently, after the possibility of Selzer's involvement with the CIA became generally known, Selzer informed the members of the Political Science Department that, if he had any contact with the CIA, it was solely to relay information imparted to him overseas. Though Selzer also stated that he would never compromise his colleagues "by imparting any information they had revealed to (him) or which any source to whom they had directed (him) had revealed to (him)," his refusal to admit the fact of his association with the CIA obviously discredited his assertions