Mary JONES, Beverly Harris, Ernest Simmons, Mildred Malloy, Individually, and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

AMALGAMATED WARBASSE HOUSES, INC., New York State Division of Housing and Community Renewal, Defendants.

No. CV 80–3444.

United States District Court,
E.D. New York.

Nov. 15, 1982.
On Award of Fees Feb. 18, 1983.

Steel & Bellman, P.C. by Richard F. Bellman, Lawrence M. Grosberg, Fair Housing Clinic, Columbia Univ. Law School, Karen Freeman, New York City, for plaintiffs.

Kornstein Meister & Veisz by Ronald W. Meister, New York City, for Amalgamated Warbasse Houses, Inc.

Robert Abrams, Atty. Gen. of N.Y. by Stephen M. Jacoby, Asst. Atty. Gen., New York City, for New York State Div. of Housing and Community Renewal.

## MEMORANDUM & ORDER

PLATT, District Judge.

The parties to this would-be class action seek approval of an Order and Judgment of Consent (settlement agreement) submitted pursuant to Fed.R.Civ.P. 23(e). No class members objected to the proposed settlement at a hearing on October 15, 1982, and none submitted opposition in writing. For this reason and those that follow, the agreement will be approved.

### I. *Introduction*

Plaintiffs allege that Amalgamated Warbasse Houses, Inc. (Warbasse), a limited-profit mutual housing company located near the Coney Island section of Brooklyn, and the New York State Division of Housing and Community Renewal (Division)[1] systematically prevented Black and Hispanic citizens from obtaining apartments at the 2,585-unit Warbasse complex, thereby violating the Thirteenth and Fourteenth Amendments to the United States Constitution, Title VIII of the Civil Rights Act of 1968 (42 U.S.C. § 3601 et seq. (1977)), 42 U.S.C. §§ 1981–1983 (1981), and the New York Human Rights Law (N.Y.Exec.Law § 296(2–a) (McKinney 1982)).

This action was commenced on December 16, 1980. Shortly thereafter, both defendants moved to dismiss, while the plaintiffs sought injunctive relief. However, decision was reserved pending the outcome of settlement talks initiated, or at least encouraged, by Division Commissioner Richard Berman, a co-defendant. Magistrate A. Simon Chrein subsequently assisted in the negotiations, and on August 9, 1982 the parties submitted the proposed settlement agreement. This Court thereupon ordered that notice of the settlement be published in the minority press and mailed to each of the approximately 1,570 apartment applicants on the Warbasse waiting list. Comments were to be submitted by October 8, 1982. The hour-long hearing took place a week later.

### II. *The Settlement Agreement*

As an initial matter, plaintiffs are to be certified pursuant to Fed.R.Civ.P. 23(b)(2) as representatives of the class of all Hispanic (Caribbean and Central American) and Black persons who have sought or may seek to live in the Warbasse complex.[2] Order and Judgment of Consent, ¶ 2.[3]

Second, to compensate for past underrepresentation of class members at Warbasse, defendants will establish a minority list and fill 215 apartments from it. Applications will be solicited through notice in the general and minority media. The list is to be

---

1. As a Mitchell-Lama project (*see* N.Y.Priv. Hous.Fin.Law § 10 *et seq.* (McKinney 1976)), Warbasse is supervised by the New York State Division of Housing and Community Renewal (the Division).

2. According to data developed by the Division, 99 percent of the residents of Warbasse were White and 1 percent were members of minority groups as of July 10, 1980. Affidavit of Edmund Davis, exhibit 1.

3. Hereinafter, references to the proposed settlement will be by paragraph number only.

divided by apartment size into three groups: 121 one-bedroom units, 67 two-bedroom units, and 27 three-bedroom units. According to preference, individuals will be placed in one of these groups, in the order in which their ·applications are received.[4] Then they will be "shuffled" into the existing (outsiders') list of non-Warbasse residents waiting for units, in the following ratios: one minority applicant to five outsiders for one-bedroom units; two minority applicants to seven outsiders for two-bedroom units; and one minority applicant to three outsiders for three-bedroom units. ¶¶ 6(c)(ii), 11. In each case, the minority applicant or applicants will be selected before the individuals on the outsiders' list.[5] ¶¶ 11, 12. When the 215th unit is filled, the minority list will cease to exist.[6]

Third, Warbasse residents will continue to receive priority in seeking transfers to other units within the complex. ¶ 9.

Fourth, the "children's" list is to be closed, and those currently on it will be "shuffled" into the outsiders' list, five outsiders to every child.[7] ¶ 10. Heretofore, the former has placed the sons and daughters of Warbasse residents in a preferred position.

Fifth, the outsiders' list—for which income is the only admission criterion—will be maintained, although applicant solicitation is to be extended to the minority press. ¶ 24. Class members both on and off the minority list may apply for admission to the outsiders' list on equal terms with all others. However, no one will be permitted to remain on both lists. ¶ 25. Moreover, each minority group member beyond 100 on the outsiders' list will reduce by one the total number that Warbasse must accept from the minority list. ¶ 25.

Finally, defendants have agreed to pay plaintiffs attorneys' fees and costs totaling $41,750. ¶ 27. This will be reduced to $26,000, a matter discussed in Part IV.

## III.  *Discussion*

To win court approval, a class action settlement generally "must be fair and reasonable and in the best interests of all those who will be affected by it." 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1797, at 229 (1972) [hereinafter cited as Wright & Miller]. *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982) (Friendly, J.), *aff'g* 91 F.R.D. 494 (S.D.N.Y. 1981); *Tornabene v. General Development Corp.,* 88 F.R.D. 53, 61 (E.D.N.Y.1980), *aff'd mem.,* 657 F.2d 265 (2d Cir.1981), *modified* (July 31, 1981); *West Virginia v. Charles Pfizer & Co.,* 314 F.Supp. 710, 740 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). While the settlement proponents bear the burden of demonstrating fairness, 7A Wright & Miller § 1797, at 229 "[v]oluntary out of court settlement of disputes is 'highly favored in the law,' " *Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980) (quoting *D.H. Overmyer v. Loflin,* 440 F.2d 1213, 1215 (5th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971)), *aff'd,* 682 F.2d 355 (2d Cir.1982);

---

**4.** The four named plaintiffs have 30 days from the entry of the Order and Judgment on Consent to request placement at the top of the minority list. ¶ 6(f). No objections to this provision have been filed, and even if they had been, disapproval would not be warranted since the advantage is not excessive. *Luevano v. Campbell,* 93 F.R.D. 68, 89 (D.D.C.1981); *Bacote v. Long Island Savings Bank,* No. 78 Civ. 1285, at 5 (E.D.N.Y. Sept. 1, 1982). Moreover, minorities presently on the outsiders' list may request placement on the minority list in their existing order, although in back of the named plaintiffs who exercise their option. ¶ 6(f).

**5.** The settlement provides for subsequent adjustment of these ratios to ensure that all the units in each category are filled at approximately the same time. ¶ 23.

**6.** Subject to Division approval, the agreement permits Warbasse to place up to 100 additional names on "reserve status." ¶¶ 6(c)(iv), 7. Conversely, if too few minority group members apply for housing, the agreement obligates Warbasse to solicit applicants on up to three additional occasions. ¶ 8.

**7.** Until now, one name has been taken from the children's list for every five names taken from the outsiders' list. Thus, those presently on the children's list will lose nothing vis-a-vis outsiders.

*Newman v. Stein,* 464 F.2d 689 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *see Tornabene v. General Development Corp., supra,* and "approval of class action settlements will be generally left to the sound discretion of the trial judge." *Wellman v. Dickinson,* 497 F.Supp. 824 at 830 (citations omitted). This is particularly true in Fair Housing Act cases, where the alternative to voluntary agreement—a court-ordered injunction—may inhibit cooperation and voluntary compliance. *Williamsburg Fair Housing Committee v. New York City Housing Authority,* 450 F.Supp. 602, 606 (S.D.N.Y.1978). *See Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017–18, 39 L.Ed.2d 147 (1974) (Title VII). Moreover, a proposed settlement "carries . . . its own presumption of regularity and is subject to approval by the trial court after hearing proffered objections." *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1013 (7th Cir. 1980) (consent decree in discriminatory zoning case). Thus, the court will not substitute its judgment for that of counsel who, after the type of arm's-length bargaining that took place in this case, "have made a determination that the settlement represents a fair and real appraisal of their clients' chances of ultimate success." *Siegel v. Realty Equities Corp. of New York* [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,102, at 94,446 (S.D.N.Y.1973). *See Weinberger v. Kendrick, supra,* at 74 (examination by court of settlement's substantive terms necessarily must be limited).

■ Nevertheless, when reviewing a class action settlement the District Court also is " 'a fiduciary who must serve as a guardian of the rights of the absent class members.' " *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1099 (2d Cir.1977) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)). In fulfilling its role, the court looks to the following factors: (1) the presence of collusion in reaching the settlement; (2) counsel's experience in handling similar cases; (3) the extent of discovery and its impact on counsel's ability to make an informed decision as to the merits of the case and the fairness of the settlement; and (4) the objections of class members. *George v. Parry,* 77 F.R.D. 421 (S.D.N.Y.) (civil rights action), *aff'd mem.,* 578 F.2d 1367 (2d Cir.), *cert. denied,* 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Bacote v. Long Island Savings Bank,* No. 78 Civ. 1285, at 1 (E.D.N.Y. Sept. 1, 1982); *Connolly v. New York City Transit Authority,* No. 74 Civ. 1085, at 4 (E.D.N.Y. Jan. 26, 1982); *Tornabene v. General Development Corp., supra; Duban v. Diversified Mortgage Investors,* 87 F.R.D. 33, 38–41 (S.D.N.Y.1980); *Munsey Trust v. Sycor, Inc.,* 457 F.Supp. 924, 926 (S.D.N.Y.1978); *Feder v. Harrington,* 58 F.R.D. 171 (S.D.N.Y.1972).

These factors need not be exhaustively analyzed in this case, for it is amply clear that the settlement survives scrutiny.

■ First of all, not one grain of evidence suggests that opposing counsel colluded in drawing up the 19-page settlement agreement. In the absence of such evidence—at least where the proposed agreement on its face suggests that a *bona fide* compromise has been crafted—the settlement is presumed to be regular. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d at 1013–15. Here, many signs of compromise exist. Not only did the named plaintiffs initially seek damages in addition to injunctive relief, but the relief requested for the entire, open-ended class could have been equally open-ended (at least in duration), and it could have involved far more than 215 units (8 percent of the total) at Warbasse. Moreover, class members will not be given full priority over others on the outsiders' list. Rather, as described above, they will be "shuffled" into the pack, in adjustable ratios now ranging from one:three to one:five. Current residents, virtually all of whom could never become members of the minori-

ty class, will continue to receive full priority with regard to internal transfers.[8]

At the same time, plaintiffs have obtained significant relief—the virtual guarantee that nearly a tenth of the units at the Warbasse complex will be occupied by members of minority groups. Merely by way of observation, we note that these 215 minority units may provide the "critical mass" needed to create and maintain a more heterogenous community at Warbasse.

■ Second, we find that counsel have had sufficient experience in class action litigation to arrive at a fair and reasonable compromise. The lead attorney for the class was ably assisted by lawyers from the Fair Housing Clinic at Columbia University and the Open Housing Center. On the other side, attorneys representing Warbasse received assistance from the New York State Division of Housing and Community Renewal. That a government agency participated in successful compromise negotiations and endorsed their results is a factor weighing heavily in favor of settlement approval—at least where, as here, the agency is "committed to the protection of the public interest." *Wellman v. Dickinson*, 497 F.Supp. 824 at 830 (SEC participation).

■ Third, it is clear from the affidavits accompanying the several motions that the attorneys have made an informed decision as to the merits and the fairness of the compromise. Although little formal discovery has occurred, the parties freely exchanged data during settlement talks.[9] In view of the way this speeds the negotiation process, informal "discovery" is to be encouraged. Settlement is particularly appropriate where these preliminary inquiries indicate that the litigation will be long and complex, and the outcome far from certain.

*Beecher v. Able*, 72 F.R.D. 518, 520 (S.D.N.Y.1976) (Motley, J.), *mod.*, 441 F.Supp. 426 (S.D.N.Y.1977), *aff'd*, 575 F.2d 1010 (2d Cir. 1978); *West Virginia v. Charles Pfizer & Co., Inc., supra.*

■ The final and "crucial" factor in evaluating the fairness of the settlement agreement is whether the interests of the class members have been taken into account. 7A Wright & Miller § 1797, at 182 (Supp.1982). To ascertain this, the court should consider how knowledgeable plaintiffs' attorneys were, and whether opponents presented persuasive arguments against the settlement. We concluded above that plaintiffs' attorneys are well-informed. Moreover, not a single class member submitted a written statement prior to or appeared at the hearing on October 15, 1982. This leads to only one, obvious conclusion: that the class supports the settlement.

Although one oral and five written objections were submitted by non-class members,[10] the court has serious doubts as to whether it must consider these comments, *see Kusner v. First Pennsylvania Corp.*, 74 F.R.D. 606, 611 (E.D.Pa.1977) (settling defendant's shareholder not permitted to intervene and object), *aff'd mem.*, 577 F.2d 726 (3d Cir.1978), particularly where, as here, State law grants Warbasse the power to sue and be sued, N.Y.Priv.Hous.Fin.Law § 17(1)(j) (McKinney 1976). These individuals may continue to pursue whatever rights they may have to force Warbasse to redress allegedly improper actions taken in settling this lawsuit. Moreover, even assuming that the objections must be considered, we find that they do not alter the outcome. First of all, the six opponents comprise only a tiny fraction (0.38 percent, to be precise) of those currently on the

---

**8.** *See supra* note 2.

**9.** Plaintiffs' interrogatories to Warbasse and to the Division went unanswered. Neither side took depositions. However, plaintiffs apparently sought to demonstrate discriminatory impact, an approach that might well find most useful the type of data amply provided by way of affidavit and appendix thereto.

**10.** Five currently are on the outsiders' or the children's list, while the sixth wrote on behalf of a parent on the outsiders' list. We emphasize that everyone on an existing waiting list received mailed notification of the proposed settlement, comment deadline, and hearing date.

outsiders' list, and surely a tinier one when compared to the number of persons presently in the certified class. Second, most of these comments make one point: that each individual earned his place on the waiting list and that settlement approval will interfere impermissibly with this "entitlement." The short, and sole, answer is that no such entitlement exists. Outsiders are not being forced to forfeit their status as members of the list; rather, they merely may have to wait somewhat longer for an apartment. This potential delay is not legally significant and therefore does not provide a basis for disapproving the settlement. *See, e.g., Franks v. Bowman Transportation Co.,* 424 U.S. 747, 775–78, 96 S.Ct. 1251, 1269–71, 47 L.Ed.2d 444 (1976) (union seniority system). Put another way, although opponents complain that the glass is now half empty, it is really half full: The settlement might have eliminated the outsiders' list entirely, and in the process returned each person on it to parity with all new applicants.

## IV.  *Attorneys' Fees*

Plaintiffs' attorneys have requested attorneys' fees of $41,350 and costs of $400, or a total of $41,750 for their services in this matter. Lead counsel, Richard S. Bellman, Esq., in an affidavit sworn to October 18, 1982, has stated that he spent 241 hours, that Lawrence Grosberg, Esq., of the Fair Housing Clinic at Columbia University, spent 60 hours and that Karen Freeman, Esq., of the Open Housing Center, spent 20 hours working on this case. He sets the value of their services at approximately $129 per hour. By his own admission, however, Mr. Bellman states that "A substantial portion of my work related to [the] negotiations" which led ultimately to the proposed consent now before this Court. Mr. Bellman does state that the fees themselves were the subject of negotiations between the parties and that they were ultimately agreed to by counsel for the defendants herein. In this case, if the defendants were private parties dealing with private funds this Court might be tempted to assume "reasonableness" and to accept the results of these negotiations in the absence of any indication of collusion. However,

here both defendants, for the most part at least, are dealing with taxpayers' funds. Under these circumstances, this Court feels constrained to scrutinize the attorneys' request with more care.

■■■■  As an initial matter, once a court has determined that attorneys' fees are to be awarded, the amount of the award is within the discretion of the court. *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.91, at 23–566 (2d ed. 1982). This discretion, however, is not unbounded. Factors that a trial judge should consider in computing a fee award include the following:

(1) The time and labor required.

(2) The novelty and difficulty of the questions.

(3) The skill requisite to perform the legal service properly.

(4) The preclusion of other employment by the attorney due to acceptance of the case.

(5) The customary fee.

(6) Whether the fee is fixed or contingent.

(7) Time limitations imposed by the client or the circumstances.

(8) The amount involved and the results obtained.

(9) The experience, reputation, and ability of the attorneys.

(10) The "undesirability" of the case.

(11) The nature and length of the professional relationship with the client.

(12) Awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974); *Selzer v. Berkowitz,* 477 F.Supp. 686 (E.D.N.Y. 1979). After taking into account each of these factors, we are convinced that a fee reduction is in order. It should be stressed that

[e]ven where there has been no objection to the size of the attorney's fee requested, it is the responsibility of the court to

see to it that the size of the award is reasonable.

3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.91, at 23–568 (2d ed. 1982). *See* 42 U.S.C. § 1988 (1981) (court may award "reasonable" attorney's fee to prevailing party in civil rights action).

■ This court is particularly concerned that the requested fees seem out of line with other matters which it has been called upon to review. For example, in *Selzer v. Fleisher,* 629 F.2d 809 (2d Cir.1980), *rev'g Selzer v. Berkowitz,* 477 F.Supp. 686 (E.D. N.Y.1979), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981), also a civil rights case, the plaintiff was represented by the firm of Donovan Leisure Newton & Irvine, 30 Rockefeller Plaza, New York, and Walter L. Stratton, Esq., one of the senior trial partners in that firm (also a very experienced trial lawyer) who tried the case, valued his and his partners' time at $125 per hour and the time of his associates and others at substantially less per hour.[11] By way of contrast to the case at bar, both sides in that case took extensive depositions, conducted protracted and complicated pretrial discovery and briefed and argued numerous complex legal questions before, during and after the eight-week jury trial, which resulted in a substantial verdict for the plaintiff. When this Court in that case approved the indicated attorneys' fees of $125 per hour and less, the Court of Appeals for this Circuit implied that these fees were excessive in the following language:

> Appellants challenge as excessive the trial court's award of attorneys fees in the amount of $433,458.73. In the event that the trial court is again called upon to fix attorneys fees, we are confident it will note, as this Court has recently suggested in *Seigal v. Merrick,* 619 F.2d 160, 164, Nos. 79–7420, 79–7444, (2d Cir.1980), that any award must be proportionate to the result achieved.

629 F.2d at 814 (footnote omitted). *See also Tornabene v. General Development Corporation, supra* (court reduced fees and costs to 36 percent of figure agreed to by defendants). The work involved in this case does not begin to measure up to the complexity and difficulty of the work in that case. Moreover, the results achieved in that case were on a comparative basis substantially greater than the results achieved here. Under these circumstances, this Court feels it is compelled to reduce the hourly rate requested by the plaintiffs from approximately $129 per hour to approximately $75 per hour, yielding the plaintiffs' attorneys a gross fee of $24,000 plus $400 in costs. In order to make an allowance for any additional work that may be necessary in connection with the implementation of the order herein, the Court will round the gross fee to $25,600 plus $400 in costs, or a total of $26,000.

Based upon the proportion heretofore adopted between the defendants, the amount of the $26,000 allocable to the defendant Warbasse will be $15,880 and the amount allocable thereof to the Division will be $10,120.

SO ORDERED.

### On Award of Fees

At issue is the fee award ordered in the settlement of a housing discrimination class action. Defendants Amalgamated Warbasse Houses, Inc. (Warbasse) and the New York State Division of Housing and Community Renewal (Division), in settling the case, agreed to a total of $41,350 in fees. In a Memorandum & Order dated November 15, 1982 (the November 15 Order), the Court approved all aspects of the settlement except for the fee agreement. On that score, we reduced the total figure to $25,600, which—after including $400 in costs not affected by the reduction—was allocated as follows: $15,880 to be paid by Warbasse and $10,120 by the Division. Looked at another way, the fee as reduced

---

11. In that case, plaintiffs' counsel spent 5,481.25 hours of attorney time plus 2,118.25 hours of para-attorney (i.e., summer associates, student interns, and paralegals) time. As we pointed out in our opinion, the average legal and para-legal time charge there was $60.00 an hour. 477 F.Supp. at 690–91 & n. 3.

will provide compensation at the rate of $75 an hour (not including $1,600 for additional work to be performed); the pre-reduction rate was approximately $129 an hour.

Pursuant to Fed.R.Civ.P. 59(e), plaintiffs' attorneys seek to amend the November 15 Order by restoring the award to its negotiated level. The fee reduction is attacked on numerous grounds. The more significant among these are that (1) in recent settlements of a like nature, courts have authorized awards equal to or exceeding the negotiated amount; (2) significant time was devoted to drafting pleadings, pretrial motion practice, and discovery—in short, to matters some would argue are more complex than settlement negotiations; (3) settlement of this particular class action was as difficult as more highly remunerated settlements because it involved intricate and novel issues; (4) all three attorneys, and especially lead counsel Richard F. Bellman, possess great expertise and experience in fair housing and class action litigation; and (5) contrary to this Court's asserted conclusion, the portion of the award paid by Warbasse will not directly or indirectly affect State taxpayers.

After considering these points, and subsidiary matters, we conclude that the fee reduction was appropriate and hence decline to amend the November 15 Order.

■ It is important initially to note that, while Courts have only limited discretion to deny fees to settling plaintiffs, their discretion in determining the amount of the award is quite broad. *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). We certainly are not bound by the negotiated settlement, *Levin v. Mississippi River Corp.,* 377 F.Supp. 926, 931 (S.D.N.Y.1974), and to the extent our discretion is limited, it is limited by the obligation to ensure that the fee award is reasonable—indeed moderate. *Selzer v. Fleisher,* 629 F.2d 809, 814 (2d Cir.1980); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1947). 42 U.S.C. § 1988 (1981).

■ Considering the objections in order, it is not true, in the first place, that in all recent settlements of civil rights cases courts have awarded fees at a higher rate. While some have, *e.g., Bradford v. Blum,* 507 F.Supp. 526 (S.D.N.Y.1981) ($125 an hour for experienced private counsel), others have not, *e.g., Cleary v. Blum,* 507 F.Supp. 514 (S.D.N.Y.1981) ($75 an hour for experienced private counsel). As the Second Circuit recently had occasion to point out, a fee award need not be set at "the rate which a lawyer charges his other clients." *McCann v. Coughlin,* 698 F.2d 112, 130 (2d Cir.1983). The award here is well within the range of reasonableness. This is particularly true given the fact that lead counsel Bellman, who has practiced law for about 20 years, with 15 years' experience in civil rights litigation, billed only 241 of the 321 hours plaintiffs' counsel had logged by the time the settlement agreement was completed. The remainder was billed by less experienced counsel, Lawrence M. Grosberg (13 years of practice, eight in the civil rights area), and Karen Freeman (about eight years of practice, six in civil rights). The $25,600 award represents a $75-an-hour rate of compensation. This is a fair average, considering both the fact that lead counsel billed only three-quarters of the total number of hours logged, and that the $75 across-the-board figure includes *all* work, from the most routine to the most challenging. In addition, the fee here is in line with the $60 an hour fee award granted by this Court in *Selzer v. Berkowitz,* 477 F.Supp. 686, 690–91 (E.D.N.Y.1979), and discussed in the November 15 Order.[1] Moreover, we note that two analogous at-

---

1. As we pointed out in that Order (97 F.R.D. at 362), Walter L. Stratton, lead counsel in that case, valued his time at $125 an hour. However, Mr. Stratton then had about 27 years of litigation experience, far more than any of plaintiffs' counsel here. In addition, the cost of overhead at his law firm, Donovan Leisure Newton & Irvine, most likely was considerably greater than the total cost to all three attorneys in this case. Moreover, on appeal the Second Circuit suggested that the award was excessive. *Selzer v. Fleisher,* 629 F.2d 809, 814 (2d Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981).

torney fee statutes, although not controlling here, support the conclusion that a $75-an-hour average is adequate, to say the least. The first, the Equal Access to Justice Act, Pub.L. 96–481, Tit. II, § 203 (to be codified at 28 U.S.C. § 504) and § 204 (to be codified at 28 U.S.C. § 2412), imposes a fee ceiling of $75 an hour against federal defendants, absent a showing of special circumstances.[2] The second, the Criminal Justice Act, 18 U.S.C. § 3006A (1982), limits compensation to $30 an hour for in-court time, and $20 an hour for reasonable out-of-court time, for attorneys appointed to the constitutionally vital task of representing indigent criminal defendants—situations in which a person's liberty usually is at stake. 18 U.S.C. § 3006A(d)(1).[3]

Plaintiffs also assert that the award was established without first designating a "lodestar" figure—the fee that attorneys of similar experience would receive for like work—and then adjusting the total to take into account such factors as the risk and complexity of the litigation. *See Cohen v. West Haven Board of Police Commissioners,* 638 F.2d 496, 505 (2d Cir.1980). However, the November 15 Order does show the result of applying the two-step *Cohen* analysis;[4] and although counsel has now supplied the Court with additional detail, it does not change the result. To be explicit, the $25,600 total—taking into account each attorney's litigation (and especially civil rights) experience described above—is calculated according to the "lodestar" method, as follows: Mr. Bellman, who spent 241 hours on this case, is to be compensated at the rate of $77 an hour, for a sub-total (see

*infra*) of $18,557; Mr. Grosberg, who spent 60.5 hours, at $70 an hour, for a total of $4,235; and Ms. Freeman, who spent 20.5 hours, at $60 an hour, for a total of $1,230. Adding the total for each attorney in turn yields $24,022 which, rounded to $24,000 is $1,600 less than the $25,600 award. Counsel has advised the Court that further work will be necessary to implement the order. The additional $1,600 will be allocated to Mr. Bellman as payment for this work. At his $77 rate, this provides for 20.8 extra hours.[5]

After considering adjustment of each "lodestar," we conclude that they should remain as they are in view of (1) the comparatively small risk involved for plaintiffs' counsel; (2) the relatively uncomplicated nature of the litigation; and (3) the fact that the settlement represents a compromise—plaintiffs did not "win." *See Selzer v. Fleisher,* 629 F.2d at 814 ("any award must be proportionate to the result achieved").

Plaintiffs' second essential objection—that, contrary to the asserted implication of the November 15 Order, significant time was devoted to matters putatively more complex than settlement negotiations—is an extension of the first. Mr. Bellman has submitted an affidavit stating that only 114 of his 241 hours were devoted to the settlement process. The remainder was spent in initial work with the plaintiffs (preparing, filing, and amending the complaint) (30.5 hours); pretrial interrogatories (19.67 hours); motion for preliminary injunction (43.32 hours); and opposing motions to dismiss (33.75 hours).[6] However,

---

2. These include cost-of-living increases, and the limited availability of qualified attorneys.

3. In addition, the Act sets maximum fees, *e.g.,* $1,000 per attorney for felony trials.

4. *See* November 15, 1982 Memorandum & Order, 97 F.R.D. at 362 & n. 11.

5. It should be kept in mind that we have made a rather generous estimate of additional time which Mr. Bellman may be required to work on this matter, to wit: some 20 additional hours at $77 per hour. If little or no such additional work is required, Mr. Bellman's hourly fee in the matter will average about $83.50 an hour.

6. Mr. Grosberg's affidavit reveals that he spent the bulk of his time involved in initial legal research, client interviews, discovery and factual investigation. Ms. Freeman divided her time roughly between court appearances, meetings and settlement discussions, according to her affidavit. We also note the possibility that some duplication of effort may occur when more than one attorney works on a case. To show that this did not happen, the three plaintiffs' counsel could have submitted more detailed time records. They did not, and the burden squarely rested on their shoulders to have done so. *McCann v. Coughlin,* 698 F.2d 112, 131 (2d Cir.1983).

we did not mean to (and believe we did not) imply that negotiation is less difficult than other preliminary litigation matters. Rather, in addition to counsel's experience, the key factor in determining the rate of compensation was that this lawsuit was settled before it became necessary to take extensive depositions, brief numerous legal points, or prepare for and—most importantly—conduct a protracted jury trial. *Compare Selzer v. Berkowitz, supra.*

Plaintiffs' third and fourth objections are, we believe, adequately answered by the above discussion. The abstract complexity of the issue is less important than the type of work performed, and the result achieved. These factors have already been considered. Moreover, although counsel's qualifications are not in doubt, we believe that the approved compensation accurately reflects those qualifications.

Finally, plaintiffs argue that Warbasse's share of the settlement does not involve taxpayers' funds, and that, even if it did, the Court would not be justified in taking that factor into account (as it is alleged to have done) in setting attorneys' fees. While we question the assertion that the Warbasse portion has no impact on taxpayers' funds (and note that the Division's portion certainly does), the matter need not be decided for we merely stated in the November 15 Order that the involvement of public money merely prompted the Court "to scrutinize the attorneys' request with more care." However, the request was reduced not because of the public funds involved but because of the factors discussed in more detail above.

In summary, plaintiffs have not convinced this Court that its initial determination was wrong. Therefore, the motion to amend the November 15 Order will be denied.

SO ORDERED.