Julio HUERTAS, et al., Plaintiffs,

v.

EAST RIVER HOUSING CORP., et al., Defendants.

No. 77 Civ. 4484 (RLC).

United States District Court, S.D. New York.

Feb. 28, 1986.

Opinion Approving Settlement Oct. 15, 1986.

---

Kenneth Kimerling, Puerto Rican Legal Defense & Educ. Fund, Inc., New York City, for plaintiffs.

Szold & Brandwen, P.C., New York City, for defendants; Alan G. Blumberg, Peter J. Shatzkin, Paul J. Sleven, Nathan Lewin, Miller, Cassidy, Larroca & Lewin, of counsel.

## OPINION ON ATTORNEY FEES

ROBERT L. CARTER, District Judge.

This case has been in litigation since September 12, 1977. The action was commenced by individual Hispanic and black plaintiffs and two organizations (It's Time, Inc. and the Lower East Side Joint Planning Council on Housing) representing blacks and Hispanics. Throughout its pendency, the litigation has been handled by counsel on the legal staff of the Puerto Rican Legal Defense and Educational Fund, Inc. The case was certified as a class action on March 6, 1978, and the class was defined as: "[A]ll Puerto Rican, other Hispanic and Black homeseekers who have completed or will complete applications for occupancy in the cooperative apartments owned by the defendants and who have been or may be denied the opportunity to purchase those apartments because of their national origin or race; and (b) all Puerto Rican, other Hispanic and Black homeseekers who have had or will have an interest in buying a cooperative apartment owned by defendants but who have been discouraged and dissuaded from completing an application to do so by any act of

defendants prohibited by" federal laws prohibiting violation of one's civil rights (42 U.S.C. §§ 1981 and 1982) and discrimination in housing (42 U.S.C. § 3601 et seq.).

Defendants are four housing developments on the Lower East Side of New York run and maintained by the East River Housing Corp., Seward Park Housing Corp., Hillman Housing Corp., and Amalgamated Dwellings, Inc. In addition, Harold Ostroff, as President and Board member of Seward Park Housing Corp., and Ralph Lippman, as President and Board member of the other three corporations, are named as individual defendants.

In February, 1981, the case was tried to the court without a jury. Thereafter, at the court's urging, beginning in December, 1981, counsel and the parties met periodically to seek a settlement. In March, 1982, the parties and counsel conferred with the court on a proposed settlement. The proposal was accepted by the defendants but rejected by plaintiffs. Beginning approximately in July, 1984, again at the court's urging, the parties and counsel conferred in an attempt to reach an acceptable solution. Finally, in January, 1985, the parties and counsel reached an agreement in principle. Counsel worked together on a stipulation of settlement which was reduced to final form and agreed to by the parties in September, 1985.

Not included in the stipulation of settlement is the issue of attorneys' fees sought by counsel for the plaintiffs. Defendants have not signed the stipulation of settlement, although agreeing to all of its terms, apparently because they felt they could not accept it until they knew what the award to plaintiffs' counsel would be. Defendants are bound by the settlement whether or not they are content with the court's decision on the attorneys' fee.

■ The court has the inherent power and, indeed, a duty to enforce a settlement in a case pending before it. *Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir.1974); *Ozyagcilar v. Davis,* 701 F.2d 306, 308 (4th Cir.1983); *Dankese v. Defense Logistics Agency,* 693 F.2d 13, 16 (1st Cir.1982); *Wiltgen v. Hartford Accident and Indemnity Co.,* 634 F.2d 398, 400 (8th Cir.1980), *see also In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975,* 687 F.2d 626, 629 (2d Cir.1982) ("district court erred in not reducing the award of costs to reflect the [settlement] agreement that the claims of certain plaintiffs were settled 'without costs' ").

In January, 1985, the court met with representatives of the parties authorized to act on their behalf. Over a number of hours the court met with the parties jointly and separately to discuss various provisions of the proposed settlement. When one side raised reservations about a particular provision with the court, modifications were proposed until finally a full settlement was reached in principle. As the Ninth Circuit stated in *Dacanay v. Mendoza,* 573 F.2d 1075, 1078 (9th Cir.1978), "a litigant can no more repudiate a compromise agreement than he could disown any other binding contractual relationship."

■ The agreement was arrived at in lengthy arms-length negotiations and seems fair and reasonable and in the best interests of the plaintiffs' class and, indeed, of defendants as well. If defendants find themselves unhappy about the court's attorneys' fee award, their remedy is to challenge it in the Court of Appeals. The settlement itself is binding on them.

Now to that unresolved issue. Plaintiffs seek $585,134.50 in attorneys' fees as well as costs and expenses totalling $28,083.63. The attorneys' fees applications consist of a lodestar figure of $292,252.25 with a multiplier of 2.0 which by my calculations brings the total sought to $584,504.50, not $585,134.50.

■ Defendants object on a variety of grounds but only a few of their contentions have merit. Defendants argue that plaintiffs are not the "prevailing party" because they did not obtain all they sought. Indeed, the plaintiffs in January, 1985, accepted settlement terms substantially similar to those they had rejected in 1982. That they received less than they sought is

irrelevant. The critical factor is whether plaintiffs succeeded on the central issue of the litigation; this is demonstrated by whether the primary relief sought has been obtained. *Iranian Students Association v. Edwards*, 604 F.2d 352 (5th Cir.1979); *American Constitutional Party v. Munro*, 650 F.2d 184, 188 (9th Cir.1981) (to be characterized as a prevailing party, one must establish "some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized") (emphasis in the original). Defendants are hard-pressed to contend seriously that plaintiffs do not meet that standard. They have secured a settlement that protects the plaintiff class against discrimination and provides that a certain percentage of defendants' vacancies will, over time, be filled by members of the plaintiff class. The fact that these results were produced through settlement negotiations rather than by court decree is of little consequence. *Robinson v. Kimbrough*, 652 F.2d 458, 465–66 (5th Cir.1981).

■ Defendants argue that the plaintiffs are entitled to an award of attorneys' fees only under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and not under § 1988. Under the former statute the prerequisite to any award is a showing of the plaintiffs' inability to pay. Plaintiffs invoked both statutes. The settlement explicitly eliminates language specifying fault, and the court has made no findings on that score. Indeed, the settlement renders any such findings both unnecessary and potentially harmful. However, plaintiffs should not be penalized for reaching a settlement by being precluded from seeking attorneys' fees under the more liberal § 1988 standard. Since plaintiff sought relief under both the Fair Housing and the Civil Rights Act, are the prevailing parties, and no determination has been made on the merits under either statute, they are entitled to apply for attorneys' fees under § 1988. *Gagne v. Maher*, 594 F.2d 336 (2d Cir. 1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

■ Courts have rejected the notion that fee awards should be affected by the status of the losing party, the theory being that the "reasonable value of the attorneys' time does not depend on who his or her adversary is." *Rodriguez v. Taylor*, 569 F.2d 1231, 1249 n. 32 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); *Dennis v. Chang*, 611 F.2d 1302, 1304–07 (9th Cir.1980). Thus, that defendants are not-for-profit organizations, or that the cost of the award may have to be absorbed by the cooperators in higher carrying charges is not a factor to be considered.

■ Defendants argue that the fee award should be based on a "cost plus" analysis; that is, that the fee award should be calculated on the basis of salaries paid to its lawyers by the Puerto Rican Legal Defense and Educational Fund. This would undoubtedly result in an award below market rates. However, the United States Supreme Court expressly rejected this approach in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) and held that reasonable attorneys' fee awards are to be based on "prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel."

In determining the appropriate award, the court calculates the reasonable time expended multiplied by reasonable hourly rates to arrive at the lodestar figure, *see, e.g., City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir.1977), and then adjusts the lodestar figure upward or downward. *Id.* at 1098.

■ Defendants do not question the appropriateness of the $75 hourly rate for Barbara Schulman, the $65 rate for Migdalia Maldonado, $75 and $100 rates in 1979–80 and 1981–82 respectively for Lizette Cantres, and the $75 and $100 rates in 1981–82 and 1982–84 for Rosaria Esperon. They do question the $150, $175 and $200 rates for Kenneth Kimerling for 1978–80, 1981–82 and 1983–84 respectively.

Plaintiffs are entitled to an award based on the prevailing market rates in New York. Because most of the period in question is past, the court must seek to deter-

mine the hourly rates that should be applied to Kimerling from 1978 to 1985. Kimerling is a 1969 graduate of Columbia University Law School, and has specialized in civil rights litigation during his entire professional career. Since courts are admonished to avoid windfall determinations, *Beazer v. New York City Transit Authority*, 558 F.2d 97, 101 (2d Cir.1977) (*quoting City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469-70 (2d Cir.1974) (*Grinnell I*)), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), plaintiffs are entitled to be awarded attorneys' fees for Kimerling's work based on hourly rates normally charged by attorneys of like skill for similar work. *City of Detroit v. Grinnell*, 560 F.2d 1093, 1098 (2d Cir.1977) (*Grinnell II*).

The appropriate comparison for Kimerling is to an attorney in a medium-sized firm, not one in a large firm which, because of increased overhead, charges higher rates. The historic rates sought seem somewhat high. Lawyers in the class of 1969 could in 1978-80 command $125 per hour and $165 in 1981-82. The hourly rate of $200 in 1983-85, however, is somewhat lower than the class could command since by 1984 the hourly rate was slightly over $200 and was at least $225 by 1985. However, the court cannot award more than has been sought. Therefore, we will use $125 as Kimerling's hourly rate for 1978-80; $165 for his hourly rate in 1981-82; and $200 for his hourly rate thereafter.

Defendants contend that Rosaria Esperon's time should be excluded because she was both a plaintiff and a witness in this case, as well as a lawyer. In *Rybicki v. State Board of Elections*, 584 F.Supp. 849 (N.D.Ill.1984), a *pro se* lawyer who also appeared as a witness was denied an award of attorney's fees. Esperon appeared as a witness at trial, but did not participate in the trial itself. She seeks compensation for work done both before and after trial. No purpose is served by denying plaintiffs an award for her work. The denial in *Rybicki* was meant to discourage lawyers from trying cases and appearing simultaneously as witnesses. She

did not do that. Accordingly, I see no reason to have her time excluded.

Plaintiffs' documentation does not appear to conform to the requirements of the circuit. As I understand it, the request in *In re Hudson & Manhattan R.R. Co.*, 339 F.2d 114, 115 (2d Cir.1964) that fee applications be accompanied by accurate and current records of work done and time spent has since, by virtue of *New York State Association for Retarded Children v. Carey*, 711 F.2d 1136, 1147 (2d Cir.1983), become mandatory. While the records submitted may meet the circuit's accuracy requirement, they are not current records. Current records, as I understand the term, means contemporaneous records made at the time the work was done or shortly thereafter. These records do not meet that standard and, I believe, for that reason the lodestar figure is subject to an overall reduction of 10%.

Defendants contend that no award should be made for time spent between March, 1982, when a proposed settlement was accepted by defendants and rejected by plaintiffs, and January, 1985, when plaintiffs accepted a settlement substantially similar to the proposal earlier rejected. Defendants make a valid point. The settlement agreed to now is not markedly different from the original proposal. It puts plaintiffs in eight (8) years where they would have been in ten (10), but since the starting time is two years later, the same result is reached by the same year under either proposal. Defendants should not be required to pay for time during at least part of that period. All time spent between March, 1982, and July, 1984, is eliminated. In July, 1984, negotiations recommenced and plaintiffs are entitled to compensation for time after July. I am eliminating 46.55 hours from Kimerling's time and 24.00 hours from Esperon's time to account for that.

There is no merit to the argument to exclude time related to Richard Faust's testimony. Defendants' argument borders on the absurd and smacks of Monday morning quarterbacking. Faust was regarded by plaintiffs as a key witness, and plaintiffs

duly prepared his testimony. That it may not have been as compelling as plaintiffs anticipated is beside the point. It was relevant. The argument about anecdotal testimony is somewhat disingenuous. The testimony was designed to establish a pattern of discriminatory treatment. While statistical evidence may sometimes suffice, the actual experiences of rejected applicants reinforce the statistical picture. Indeed, if the case went to determination and the court accepted Faust's testimony as to defendants, plaintiffs would have been largely left with only anecdotal experiences.

Defendants' contention that all time spent prior to filing the complaint should be excluded has no merit. Indeed, probably the most important aspect of litigation is prefiling preparation. At this time a plaintiff canvasses the statutory and case law and evaluates various legal strategies. In a housing discrimination case such as this, it selects and instructs sets of testers to make applications and, based on their treatment, begins to form a final strategy. The time during this period for which fees are sought is reasonable. Except for the elimination of time from March, 1982, to July, 1984, all time for which compensation is sought is reasonable, and with the adjustments to Kimerling's rate indicated, the rates are reasonable.

Accordingly, Barbara Schulman in 1977–78 spent 498.9 hours at $75 an hour for a total of $37,417.50; Maldonado in 1977–78 expended 280.4 hours at $65 an hour for a total of $18,226; Cantres in 1979–80 spent 336.95 hours at $75 per hour for a total of $25,271.25, and in 1981–82 spent 286.85 hours at $100 an hour for a total of $28,-685.00; Rosaria Esperon spent in 1981–82 67.9 hours at $75 an hour for a total of $5,092.50 and in 1982–84 spent 33 hours at $100 an hour minus 24 hours for a total of $1,100. Kimerling spent 452.95 hours in 1978–80 at $125 an hour for a total of $56,618.75; 353 hours minus 11 hours or 342 hours in 1981–82 at $165 an hour for a total of $56,430; and 109.05 hours minus 35.55 or 73.50 hours for a total of $14,700. An hourly rate of $20 an hour for three paralegals and $20 an hour for Norma San-

tamaria for a total of $14,360.00 seems reasonable.

The lodestar figure is $240,543, with a reduction of ten percent across the board ($24,054.30) for not providing contemporaneous records brings the lodestar figure to $216,488.70. Plaintiff is entitled to $10,930 for time spent on the fee application and $28,083.63 for costs and expenses.

The final issue is whether the figure should have a multiplier. Plaintiffs contend that the case was exceptional; defendants argue that it was run of the mill. The court would place it in between. It is doubtful that plaintiffs could have lost a housing discrimination case in this court in 1982, when the case was tried or in 1977 when initial strategy was formulated. The law was reasonably well-settled by that time. Nonetheless, the difficulty of proving discrimination was a substantial hazard to plaintiffs when they filed the lawsuit in 1977. Moreover, defendants conceded nothing, and hired high-priced, skilled lawyers to defend the suit. The outcome was not a foregone conclusion, and defendants only make that contention now because it serves their interest. However, neither the case nor the outcome can be classified as exceptional. Plaintiffs have obtained excellent results, but my reading of the United States Supreme Court's holding in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), is that under these circumstances an award that compensates fully for time spent at reasonable hourly rates is sufficient. Accordingly, no multiplier is utilized.

Plaintiffs are awarded judgment against defendants for counsel fees of $227,418.70 and $28,083.63 for costs and expenses.

IT IS SO ORDERED.

## OPINION APPROVING SETTLEMENT

This is a housing discrimination case brought pursuant to the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* and the Civil Rights Act, 42 U.S.C. §§ 1981 and 1982. It was commenced on September 12, 1977. The litigation was originally institut-

ed by Julio Huertas, Carmen Melendez, the Lower East Side Joint Planning Council on Housing and It's Time, Inc., and others on behalf of themselves and the class they represented. The case was subsequently certified as a class action with the class being defined as

(a) all Puerto Rican, other Hispanic and Black homeseekers who have completed or will complete applications for occupancy in the cooperative apartments owned by the defendants and who have been or may be denied the opportunity to purchase those apartments because of their national origin or race; and

(b) all Puerto Rican, other Hispanic and Black homeseekers who have had or will have an interest in buying a cooperative apartment owned by defendants but have been discouraged and dissuaded from completing an application to do so by any act of defendants prohibited by 42 U.S.C. §§ 1981 and 1982 and/or by 42 U.S.C. §§ 3601–3619.

Defendant Amalgamated Dwellings, Inc. (Amalgamated) owns and operates a cooperative housing development on the lower east side of Manhattan constructed pursuant to the New York Limited-Dividend Housing Companies Law, now Article IV of the Private Housing Finance Law. It contains 235 residential apartments. This development opened for occupancy in 1930.

Defendant Hillman Housing Corp. ("Hillman") also owns and operates a cooperative housing development located on the lower east side. It was constructed pursuant to the New York Redevelopment Companies Law, now Article V of the Private Housing Finance Law. This development contains 797 residential apartments and opened for occupancy in 1949.

Defendant East River Housing Corp., ("East River") owns and operates a cooperative housing development in the area contiguous to those of Amalgamated and Hillman. This development was constructed pursuant to the New York Redevelopment Companies Law, now Article V of the Private Housing Finance Law, contains 1,672

residential apartments and was opened for occupancy in 1955–56.

Defendant Seward Park Housing Corp. ("Seward Park") owns and operates a cooperative housing development in the same area as the other three. It was constructed pursuant to the New York Redevelopment Companies Law, now Article V of the Private Housing Finance Law, contains 1,728 residential apartments and was opened for occupancy in 1960.

As indicated, the four cooperatives are adjacent to each other and for the most part are managed from one central office. Applications for apartments are dispensed, received and processed at that office and inquiries about apartment allocations are received and responded to there. In addition, there is a small branch office and applications for apartments are available at the branch office also.

The total number of residential apartments contained in the four cooperatives is 4,432. The breakdown by size of apartments is as follows: Amalgamated has 3 efficiency apartments, 110 single bedroom units, 99 two bedroom units and 23 three bedroom units. Hillman has 85 efficiency apartments, 301 single bedroom units, 340 two bedroom units and 72 three bedroom units. East River has 82 efficiency apartments, 721 single bedroom units, 769 two bedroom units and 100 three bedroom units. Seward Park has 148 efficiency apartments, 896 single bedroom units, 535 two bedroom units and 148 three bedroom units.

Defendant Ralph Lippman was the Executive Manager of the four cooperatives when the lawsuit commenced and had held that position since 1956. He is in charge of all administrative and management functions of the four cooperatives. His responsibilities include supervising all aspects of the handling of applications for apartments.

Since 1960, apartments in the cooperatives have been vacated and made available to non-resident applicants at an average rate of approximately 103 apartments per annum, which represents an average 2.3% annual turnover rate.

The above figures do not include moves by existing residents within the four cooperatives. All such moves are treated as internal transfers. Residents of the cooperatives who desire to transfer to different apartments within the cooperatives are given priority over non-resident applicants. Apartments become available to non-resident applicants only after all internal transfers are completed. Needless to say, virtually all three bedroom apartments that become vacant are taken by residents who transfer from smaller apartments.

Defendants' selection of tenants was handled by the executive manager, Ralph Lippman, and his staff on a highly subjective, personal and informal basis. Thus, outsiders were more likely to be discouraged from applying for vacancies or to have no advance notice of vacancies. A more recent applicant known to management or recommended to management by one of the tenants was more likely to get the vacated apartment than an applicant without access to management despite the length of time his applicaton may have been on file. This process necessarily resulted in most vacancies going to whites.

This action was brought to vindicate the rights of the plaintiff class to be free of racially discriminatory treatment in the selection of tenants to be housed in defendants' cooperative apartments. At the time of the trial, there was roughly 1.6% black and .8% Hispanic occupancy. Between 1960 and 1978, of some 1,985 new tenants awarded vacant apartments by defendants, only 35 or 1.8% were black and only 34 or 1.7% were Hispanic. While defendants do not concede that they were guilty of racial discrimination, and no such finding has been made by the court, the settlement does seek to eliminate racial disparity in the occupancy of defendants' cooperatives.

The settlement comes after trial and was arrived at after arms-length negotiations with the final negotiations that led to the agreement being overseen by the court. No member of the plaintiff class has opposed the settlement. The settlement provides that for a period of eight years after its effective date, 40% of all vacancies in efficiency and one bedroom apartments are to be allocated to blacks and Hispanics. It provides that 9 of the first 14 vacancies in two bedroom apartments shall go to blacks and Hispanics and the first three vacancies in three bedroom apartments above the sixth floor in any building shall be allocated to black and Hispanic applicants. Commencing four years after settlement becomes operative and continuing until eight years after the effective date of the settlement, blacks and Hispanics are to be allocated 44.44% of all vacancies in the two and three bedroom apartments. The settlement provides monitoring of the settlement, adequate record keeping by defendants, and access to all records by class counsel.

The parties in the court's presence agreed to the basic terms leaving to counsel the task of agreeing on the specific language of their agreement. During this process disagreements between counsel about specific language were arbitrated by the court. The agreement may be classified as a settlement judgment as that term is characterized in *Janus Films, Inc. v. Herbert Miller*, 801 F.2d 578, 582 (2d Cir. 1986).

Defendants agreed to all the settlement terms, but subsequently balked on the issue of their liability for plaintiffs' attorneys' fees. That issue was resolved separately by the court. Since the court has written separately on that question, no further reference need be made to it.

Settlements of court disputes by the parties rather than by the court is preferred. *Newman v. Stein*, 464 F.2d 689 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The prime considerations affecting court approval of class settlements are the adequacy and fairness of the agreement. *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir.1982). This settlement has been the subject of arms-length bargaining after trial; experienced class counsel is in an excellent position to evaluate the merits of the agreement against possible terms of disposition by the court; and there has been no objection to the settlement by any number of the plain-

tiff class.[1] Under such circumstances, there is a strong presumption in favor of the settlement. *Ross v. Saltmarsh,* 500 F.Supp. 935, 943 (S.D.N.Y.1980) (Lowe, J.); *Munsey Trust v. Sycor, Inc.,* 457 F.Supp. 924, 927 (S.D.N.Y.1978) (MacMahon, J.); *Guardians Ass'n of New York v. Civil Service Comm'n,* 527 F.Supp. 751, 757 (S.D.N.Y.1981) (Carter, J.). This presumption is perhaps even stronger here since the court participated in the negotiations that brought the parties to agreement.

Settlement is particularly to be favored in housing disputes involving claims of racial discrimination since the parties' agreement to a solution of a controversy seems more likely to provide the basis for future community harmony and peace than would result from a solution mandated by the court. Indeed, the court's conviction that the community would be best served by the parties' agreeing to the solution led it to withhold its decision to pressure the parties to work out a resolution that both sides found to be acceptable.

The agreement will insure that a larger number of blacks and Hispanics are afforded the opportunity to secure apartments in defendants' cooperatives when vacancies occur. The agreement is consistent with the equal protection guarantee of the Fifth and Fourteenth Amendments, *Local 28, Sheet Metal Workers International Ass'n v. EEOC,* —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Jones v. Amalgamated Warbasse Houses, Inc.,* 97 F.R.D. 355, 358 (E.D.N.Y.1983), *aff'd,* 721 F.2d 881 (2d Cir. 1983), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984); as well as the Fair Housing Act, 42 U.S.C. § 3601 *et seq., Williamsburg Fair Housing Comm. v. New York City Housing Auth.,* 450 F.Supp. 602, 606 (S.D.N.Y.1978) (Tenney, J.); and the relief is narrowly tailored to eradicate the effects of past exclusion of blacks and Hispanics from a fair share of available vacancies in defendants' cooperatives. Accordingly, race conscious relief

agreed to by the parties is appropriate. *Local 28,* 106 S.Ct. at 3053 (Brennan, J.); *id.* at 3055 (Powell, J. concurring); *Wygant v. Jackson Board of Education,* —— U.S. ——, ——, 106 S.Ct. 1842, 1852–53, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring in part and concurring in judgment).

The settlement is approved.

IT IS SO ORDERED.

---

**1.** Roughly two white tenant cooperators appeared at the hearing, apparently to raise objections to the settlement. However, not being members of the class, their consent is not a condition to a voluntary settlement of the litiga-

tion. *Kirkland v. New York State Dep't of Correctional Services,* 711 F.2d 1117, 1126 (2d Cir. 1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984).